UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRADER JOE'S COMPANY,<br><br>                Plaintiff,<br><br>      v.<br><br>GRISTEDE'S FOODS, INC. and DOES 1-10,<br><br>                Defendants. | Civil Action No. 09 Civ. 00163 (LAP)<br>ECF Case<br><br>**DECLARATION OF<br>JOHN CATSIMATIDIS IN<br>OPPOSITION TO PLAINTIFF'S<br>MOTION FOR A TEMPORARY<br>RESTRAINING ORDER** |

      I, John Catsimatidis, declare under penalties of perjury as follows.

1.    I am the owner, President and CEO of defendant Gristedes and its parent company, The Red Apple Group. I submit this declaration in opposition to the TRO application of plaintiff Trader Joe's Company.

2.    This Thursday, January 15, 2009, we plan to re-open an old Gristedes store located at 5-19 West 14th Street in Manhattan under a new name: Gristedes Trader John's. I understand that plaintiff is asking this Court to prevent us from using this new name, on the ground that (1) Gristedes supposedly chose the name to free ride on the good will associated with plaintiff's Trader Joe's name, and (2), because our name allegedly will confuse shoppers into believing either that our Gristedes Trader John's store is a Trader Joe's store, or that our store is in some way affiliated with, or was licensed by, Trader Joe's. Plaintiff is incorrect on both counts. Since I was the person who came up with the name Trader John's, and then Gristedes Trader John's, I would like to explain my thinking to the Court.

3.    I have owned the Gristedes supermarket chain for over 20 years, but the Gristedes name has been well known to New York City food shoppers for over a century. The original Gristedes was founded in 1888 by two brothers named Gristede. Today, there are approximately 35

Gristedes supermarkets in the New York metropolitan area, the vast majority of which are located in Manhattan.

4.  Like many local businesses, Gristedes' profitability has been hurt by the severe economic downturn in New York City and the surrounding suburbs. As a result of this downturn, I decided to launch, on an experimental basis, a single new store that would in certain respects (but not others) differ from our regular model for existing Gristedes stores. In particular, the new store would feature many items at prices materially lower than comparable items in our other Gristedes stores. In addition, the new store would heavily feature items sold under the ShopRite brand, under an agreement we reached with the New Jersey-based supermarket chain ShopRite.

5.  Our new store is located at the site of a former Gristedes store. To indicate to our customers that the new store will, in some respects, be different in concept from a traditional Gristedes supermarket, I decided to give the new store a different name, while at the same time maintaining much of the look and feel of our regular stores.

6.  The idea of this new, experimental store was mine alone, and I therefore wanted to put my name – John – in the store name. To reflect the generally lower prices in the new store, I first considered the names Cheap John's and John's Bargain Store, but I decided I did not like the image of either. Then another name came to mind. I have for many years referred to myself as a trader, because I made my fortune trading in the kind of goods sold in the Red Apple and Gristedes supermarket chains that I own, as well as in other commodities. Combining my name and my self-image as a successful trader, I came up with, and became enamored with, the name Trader John's. I decided to use this name for my new store.

7.  I was, of course, aware of plaintiff's national supermarket chain when I selected the Trader John's name. However, I was not attempting to piggy back on any good will belonging

2

to, or reputation associated with, plaintiff's chain. Nor do I believe for a minute that shoppers will be confused into believing that my new store is, or is in any way associated with, plaintiff's Manhattan store.

8. I have been advised that in its TRO papers, plaintiff makes much of the fact that it has become a large national supermarket chain. I don't doubt that this is so, but as I am sure the Court can appreciate, grocery shopping is a very local activity: for the most part, people living in Manhattan grocery shop in their own immediate neighborhood, and certainly primarily within the borough. As I mentioned above, Gristedes supermarkets are located exclusively in the New York metropolitan area, with the vast majority of them in the borough of Manhattan. In Gristedes local territory, Trader Joe's is not a major competitor. Despite plaintiff's much larger size nationally, I believe that plaintiff has only a single supermarket in all of Manhattan. Thus, compared to our primary competitors – the local grocery store chain D'Agostinos, the supermarket alternative retailer Fresh Direct, and the national chain Whole Foods, which has a much larger footprint than Trader Joe's in Manhattan -- plaintiff is a very small player in Gristedes' geographical market. I mention this to demonstrate that trading on any good will that Trader Joe's might have in Manhattan was the furthest thing from my mind when I came up with the name Trader John's.

9. Second, the notion that a Manhattan shopper will somehow be confused by the fact that my store and plaintiff's store both contain the word "trader" – in my opinion a generic word – followed by a person's name that starts with the letter "j" is in my judgment fanciful, and fails to take into account the enormous difference between the way consumers process the trademark for an individual grocery store item and the way consumers process the name and trade dress of the grocery store in which they shop. I am advised that in its TRO brief, plaintiff likens the impact

on shoppers of a supermarket's trademarked name to the impact of a trademark on a fruit punch drink or an inexpensive bottle of olive oil. I am not a lawyer, but as a long time supermarket owner, it is clear that there is a fundamental difference between these things which goes to the very heart of how supposedly similar trademarks do, and do not, cause consumers to be confused.

10. Assume that a shopper enters a supermarket with the intention to purchase, as the plaintiff would have it, a particular brand of inexpensive olive oil. The shopper looks at the array of olive oils on the store shelves and, based on the trademark she is familiar with, she chooses what she believes to be the brand she is looking for. If it turns out she is deceived into picking up the wrong brand due to a confusingly similar trademark, it is very likely she will not notice this until after the damage is done, in other words, after she makes her purchase.

11. By contrast, the name on the signage of a supermarket is only the first thing a shopper notices as she goes to enter the store. I don't believe that a shopper entering our new Gristedes Trader John's store will believe even for an instant that she is entering Trader Joe's, or a store that is operating with the permission of Trader Joe's. But any doubt or question will be immediately put to rest once the consumer enters our supermarket. Simply put, our new Gristedes Trader John's store does not resemble in the slightest the look and feel of plaintiff's store.

12. I understand that plaintiff's complaint and TRO brief stress the distinctive appearance of Trader Joe's stores. As plaintiff explains it, the look and feel of its Trader Joe's stores primarily include (a) a tropical, South Pacific theme, (b) employees uniformly wearing Hawaiian or flower print shirts, (c) a vast array of products bearing the Trader Joe's and related store brands (85% of all products in the store, in plaintiff's estimation) and (d) distinctive, hand made signs. In

4

addition, I understand that the plaintiff's Manhattan store (e) heavily features organic foods, (f) widely utilizes distinctive New York display scenes and symbols (for example, a painting that is designed to look like Broadway, but says "Breadway"), (g) prominently features chalk boards at the end of each aisle, and (h) has flooring painted or stained a distinct reddish color. Our new store has **none** of those features. We do not sell any "Trader John's" or "Trader anything" store brands. Rather, we feature ShopRite branded products. Our store uses shopping carts and grocery baskets bearing the Gristedes name. Plaintiff's store of course does not. Our aisles are traditional supermarket shopping aisles with a significant difference in appearance compared to the aisles in plaintiff's store. Our floor is blue and white tile, not red. Finally, to the extent that plaintiff contends that our store features wagon wheels at the base of a wooden cart with baskets to hold produce, these are the same wooden displays we have long used in Gristedes stores. Indeed, the particular displays with these features in our new store were taken from Gristedes storage.

13.     The bottom line is that whatever similarities plaintiff claims exist between the parties' trademarks, shoppers walking into either store will readily recognize that there is no affiliation or relationship between the stores. Given the extreme disparity in the appearance of the two stores, I do not believe there would be any reasonable likelihood of confusion even if the parties' marks were simply Trader Joe's and Trader John's. However, in a good faith attempt to respond to plaintiff's concerns, I agreed to add our famous corporate mark Gristedes to the words Trader John's, such that the name for our new store will be Gristedes Trader John's. The full name Gristedes Trader John's will appear on the signage for the building, and in our advertising materials for the new store.

I declare under penalties of perjury that the foregoing is true and correct. Executed on January 13, 2009 in New York, New York.

_____
John Catsimatidis